Pennsylvania Coal Company·

*v.*

Thomas Ryan.

*Filed at Ottawa June 16, 1883.*

1. Contract—*damages for non-performance—party seeking recovery must not be in default.* Before a party can enforce a contract by the recovery of damages for non-performance, he must show a performance, or its equivalent, of all conditions precedent or concurrent to be done by him. If he is himself in default of payment, and his default has not been waived, he can have no compensation for loss of profits he might have made had the contract been fully performed.

2. Same—*waiver of right to demand concurrent payment by not declaring forfeiture.* A coal company agreed with a party to furnish him with 3000 tons of coal of different qualities, to be all taken away by a given time, to be paid for at different prices. The purchaser was to pay currently, as he received the coal from time to time, so as to keep his account down to $200 or under, and to pay in full for all coal received during any given month before the 10th of the succeeding month. For non-performance on the part

of the purchaser the seller had the right to cancel the contract and forfeit the security given, which was a note of $1000, secured by mortgage. No definite time was fixed for the delivery of the coal, but the fair inference was that it was to be called for and taken in such reasonable installments, from time to time, as would take all the coal before May 1, 1881. The purchaser allowed his account to reach over $600, when he gave a note for $800, secured by chattel mortgage on his personal property, to save the same from being taken by his creditors, which was accepted by the seller as a further security for the sum then due. It was then agreed that the purchaser was to pay the sum due from time to time, and that no coal should be taken in excess of that sum, and on reducing this sum the purchaser was not to increase the same until he had brought his indebtedness down to $200. After this he was allowed to take coal without complying with the new agreement. At times he was not furnished with coal when he called for it, and he still neglected to reduce his account to $200: *Held*, that the seller did not waive his right to demand the payment of money concurrently with the application for coal because it never declared the contract cancelled, and did not place its refusal to deliver coal on account of the purchaser's default in payment; and that the fact that the seller sometimes let the purchaser have coal without payment therefor at the time, did not render the former liable for damages when it failed to deliver.

Appeal from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. John A. Jameson, Judge, presiding.

This was a suit in chancery, instituted by Ryan, the appellee, against the appellant, for an accounting and adjustment of damages claimed by complainant, alleged to have arisen from the non-performance, on the part of appellant, of a contract for the sale and delivery of a quantity of coal to appellee. The details of the transaction are set forth in the opinion of the court, and also the substance of the decree rendered in favor of the appellee.

Mr. David Fales, and Mr. C. B. Lawrence, for the appellant:

The original agreement was modified by the agreement of December 31, 1880, and for purchases of coal thereafter cash payments were necessary. As appellee made no tender of

cash, and showed no readiness or ability to pay cash, the appellant was justified in refusing him coal.

The rule is well established that where delivery and payment are to be concurrent acts, neither party can put the other in default without performing or offering to perform. *Lyon* v. *Culbertson,* 83 Ill. 33; 1 Parsons on Contracts, 537; 2 Kent, 665.

Where parties are mutually bound, one to deliver, and the other to pay, neither can sue until the property is delivered, or until the price therefor is ready and offered to be paid on a reasonable demand. (*Hungate* v. *Rankin,* 20 Ill. 639.) And there must be evidence of being ready and willing to pay. *Fink* v. *Hough,* 29 Ill. 145.

The purchaser must aver that he was ready and able to pay, and must also prove such readiness and ability to pay. *Cummings* v. *Tilton,* 44 Ill. 172; *Toppmey* v. *Root,* 5 Cow. 404; *Hough* v. *Ramsey,* 17 Ill. 588.

Messrs. Dent & Black, and Mr. R. L. Tatham, for the appellee:

That the court adopted in the decree the proper measure of damages is fully established by the following authorities: *Van Arsdale* v. *Rundel,* 82 Ill. 63; *Kritzinger* v. *Sanborn,* 70 id. 146; Sedgwick on Damages, 75; *Fox* v. *Harding,* 7 Cush. 516; *Cook* v. *Commissioners,* 6 McLean, 612; *Shepard* v. *Milwaukee Gas Co.* 15 Wis. 318; *Thompson* v. *Jackson,* 14 B. Mon. 114.

The refusal to deliver the coal was not put on the ground that appellee did not pay, but because appellant itself was unable to comply with its contract. In such case the company had no right to claim a tender. *Smith* v. *Lamb,* 26 Ill. 396; *Risinger* v. *Cheney,* 2 Gilm. 84; *Stoolfire* v. *Royse,* 71 Ill. 223; *Chamber of Commerce* v. *Sollitt,* 43 id. 519; *Lee* v. *Pennington,* 7 Bradw. 248; 2 Parsons on Contracts, 675; Pomeroy on Contracts, sec. 361, and cases cited.

But another thing is to be borne in mind, and we invoke another rule of law, viz., that where acts are, under a contract, to be concurrently performed, and therefore before one party can be put in default the other must tender performance, such tender of performance will not be required if the other party, by its own conduct, has put it out of the power of the injured party to perform. *Risinger* v. *Cheney*, 2 Gilm. 84; Chitty on Contracts, (10th Am. ed.) 811.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

By a written agreement of May 26, 1880, appellant agreed to sell and dock for appellee 3000 tons of coal, to be hauled before May 1, 1881,—two-fifths to be stove coal, two-fifths chestnut coal, and one-fifth egg and grate coal. The price of the stove and chestnut coal was to be $5.25 a ton, and the price of egg coal was to be $5 per ton, and, in addition, on each kind of coal appellee was to pay (as for storage) five cents a ton per month, from July 1, 1880, until the coal was taken away by appellee. This last charge was to be paid in advance. Appellee was to pay currently, as he received coal from time to time, so as to keep his account down to $200 or under, and to pay in full for all coal received during any given month before the 10th of the succeeding month. Appellee was to haul the coal for his own trade, and not sell to other dealers. For any non-fulfillment of any of the terms of the contract on the part of appellee, appellant had the right to cancel the contract and forfeit the security. Appellee was to give, as security for the fulfillment of the contract, his note for $1000, without interest, to run to November 1, 1880, secured by mortgage on certain land in Michigan, and might, at any time, take up the note by paying $1000. This note was not to apply in payment upon the current account, but payment of the note, if made, was to apply in payment of the last coal to be hauled under the contract. The note, and mortgage on the Michigan land,

were given when the contract was signed. No definite time was expressly fixed by the words of the contract for the delivery of any part of this coal. The fair inference from the whole contract is, that it was to be called for and taken in such reasonable installments, from time to time, as would take all the coal before May 1, 1881. If taken in proportion to the time, it would require about 265 tons each month, to be taken and paid for by the 10th day of the succeeding month. The business of the appellant at Chicago was in charge of Henry S. Van Ingen. It had one dock at the corner of Indiana street and Kingsbury street, one at the corner of Sixteenth and Grove streets, and a place of delivery, part of the time, on Canal street near Kinzie street, and it had a main office in the city, where orders for coal were received and where money was paid upon such orders. When any one was entitled to receive coal, the operators at the docks, or places of delivery, were directed by telephone from the main office to deliver coal. This mode of transacting the business was evidently known to appellee. What money he paid under this contract was always paid at the main office. Appellee began to haul coal soon after the contract was made, and continued, from time to time, in each month, to receive coal until April 30, 1881, and according to his own testimony he "got as much as he wanted up to February 5, 1881," and "got 105 tons in the first five days of February, 1881," and during the residue of February and the month of March he received $386\frac{4}{20}$ tons, and $168\frac{18}{20}$ tons in April,—in all, he received $1912\frac{17}{20}$ tons, being $1580\frac{17}{20}$ tons of stove and chestnut coal, and 332 tons of egg and grate coal.

The complaint of appellee is, that at divers times in the months of February and March, and a part of April, 1881, appellant failed to deliver to him coal when called for, and for that reason, he says, that of the 2400 bushels of stove and nut coal mentioned in the contract he failed to receive $819\frac{3}{20}$ tons, and of the 600 tons of egg coal mentioned in the

contract he failed to receive 268 tons. The decree of the circuit court recognized this claim as well founded, and in stating the account allowed him as damages for the supposed default of appellant, the sum of about $2880.96, of which about $710 was allowed for supposed defaults in not delivering egg coal, and about $2170.76 for failures to deliver stove and chestnut coal. After deducting $389.64, an unpaid balance upon coal actually received, a decree was entered against appellant for $2491.33. This decree was affirmed in the Appellate Court, and the case comes here for review.

The record does not seem, in any view, to furnish any ground for the allowance of this $710 for supposed failures to furnish egg coal. Appellee testifies that during the times of the alleged failures to furnish coal, there was, at the coal yard of appellant, "a pile of large egg coal,  *  *  *  and *that* coal was there for me.  *  *  *  *They never refused me that coal,*—that was large egg." As to the allowance of damages for the failures to deliver stove and nut coal we must look further into the record.

Appellee, soon after he began to haul under the contract, began paying, and paid currently from time to time, so as to keep his debit account down to a point not exceeding $200, until in the month of September, 1880. At the end of that month his debit balance for coal already taken was $455.50. At the end of October it was $561.18, and at the end of November $559.55, and in December his debit balance reached $613.23, and so remained to the end of that month. In the latter part of December, 1880, upon the suggestion of appellee that his teams, scales and office furniture were liable to seizure by a creditor, he gave to Mr. Van Ingen his note for $800, payable June 1, 1881, with interest, and secured the same by a chattel mortgage, duly recorded, upon the personal property mentioned, which was accepted. Appellee testifies that he proposed to appellant's manager to give the chattel mortgage "as additional security" for "the amount

of money that was standing out," and that the manager accepted the same "as security." Again he testifies: "The note and chattel mortgage were executed as security for the amount I owed the company." Again: "He," the manager, "demanded payment of the $613 balance. The agreement was * * * I should pay this $613 from time to time, as gradually as I could pay it. * * * I was to pay something on this $613, and get it down right along, currently. He said I would have to have it all paid by May 1; he said I would have to pay it all up, and pay on it just as I pleased." Being asked as to the coal he should get in the meantime,—whether he was to pay cash for that,—he answered: "I considered I always paid cash." A direct answer being demanded, he said: "No, sir, that was not the arrangement anything outside what I had been doing before. The arrangement was not that I was to pay cash for coal as I got it, and bring down this $613. I said I did not want to pay that until it expired. He said I could go ahead and pay part of it as I went along, and *I agreed to that*, and I agreed that *at no time* should any coal be sold to me *in excess of that sum*,—in excess of this $613." In an earlier part of his testimony, speaking of the chattel mortgage, he said: "There was *no modification* of the contract made when that mortgage was given." The witnesses for appellant give a version of this transaction somewhat different from that given by appellee, the only material difference being that they understood appellee's engagement in the original contract to keep his debit balance down to $200, was not affected by this new arrangement, and hence the company was not bound to let him have coal on a credit at all until the debit balance was brought down to that sum, whereas appellee evidently inferred from what was said that he was not to be allowed to buy any more coal on a credit, so as to *increase* his debit balance beyond the $613, and perhaps so as not to increase from any point to which it should be reduced, so long as it

was not reduced below the $200. Rejecting all other testimony on the subject, and taking all of the testimony of appellee into consideration, the most favorable inference to appellee that can reasonably be indulged is, that he was to have no right to receive any more coal on a credit so long as his debit balance remained as high as $613, and that he should so pay, from time to time, as gradually to reduce that debit balance. And it would seem, too, that after being partially reduced, he was not to be allowed again to increase his debit from the point to which it had been reduced, until it should fall below the sum of $200.

After this arrangement was made appellee continued to haul coal, and pay from time to time, but he did not reduce his debit balance below $613 until the last of March. The sheet of aggregate bills, given in evidence by appellee, shows that at the end of the next succeeding month (January, 1881,) his debit had increased to the sum of $762.08, and without further payments, so far as the proofs show, in the five days of February, 1881, he had been permitted to take and haul away 105 more tons of coal. Thus far he makes no complaint of his treatment by appellant. But some time in the succeeding week (whether before, on, or after the 10th of the month is not shown,) he complains that his teams were sent to one of the yards or docks of appellant for coal, and appellant's operatives there failed to furnish them coal, and that while he received coal from time to time until April 30, 1881, still it occurred that he applied often for coal when it was not furnished. His debit balance at the end of February, 1881, was $660.65, and at the end of March it was $389.87, and at the end of April it was $389.64. It is not claimed that his debit balance was, after September, 1880, ever reduced as low as $200. There is no proof in the record tending to show that he ever, at any time, failed to get coal when he offered to pay cash for it. The proof does tend to show that often when his teams came for coal appellant had

no stove or chestnut coal on hand, and that he waited until it came in on the cars. Sometimes this delay was a day or two. During all this time he was from day to day urged to make payments on his account, and from time to time did so, and on the other hand he was daily applying for coal, and getting it at some times, and at others failing to get it.

It is insisted by appellee that appellant waived the right to insist on payment of money concurrently with the application for coal, because the contract was never declared cancelled for appellee's default, and because the failures to deliver coal were not placed, at the time, upon the ground that he was in default in payment, but upon the ground that appellant's stock of coal was, for the time, exhausted. We do not see that the failure to cancel the contract by appellant can be held to be a waiver of performance of its requirements on the part of appellee. Not having cancelled the contract, the appellant simply occupies the same position it would occupy had the cancellation clause been omitted. As to the failure to demand money in advance, or concurrently, it does not seem to us to constitute such a waiver. Had the market price been lower than the contract price, and had appellant sued appellee for a failure to take the coal at times when it was not applied for, as well might appellant have claimed success without proving an offer to deliver and a demand of the money, and this upon the ground that such offer was waived by the fact that appellee did not have the money. Appellee, while his debit balance was over $613.23, had clearly no legal right, under the contract, to receive coal without concurrent full payment. The mere fact that appellant sometimes indulged him, and permitted him to do so, did not render appellant liable to further do so at times when it failed to so furnish it. It is appellee who is seeking to enforce this contract. Before he can do so he must show performance, or its equivalent, of all conditions precedent or concurrent to be done by him. By the terms of the contract

that part of the price for each ton of coal to be paid as for storage, was to be paid *in advance.* There is no pretence that this was ever offered to be done, or that this was ever waived. Appellant seems to have been willing to deliver coal when it was on hand, and appellee seems to have been willing to have paid for coal when he had the money on hand. Appellant at times was out of coal, and appellee was out of money. Appellant constantly dunned appellee for what was over due, and appellee importuned appellant for coal. Neither responded to the other's demand,—appellant for want of coal, and appellee for want of money. Each seems to have acquiesced, for the time, in the want of performance of the other, and neither can complain that the entire contract was not performed.

After a most careful consideration of all the proofs in this case, we find no just ground upon which appellee can properly have a decree for compensation for the loss of profits he might have made had he had money to fulfill his contract, and appellant had had all the coal he needed.

The judgment of the Appellate Court in this case is therefore reversed, and the cause remanded, with directions to reverse the decree and dismiss the bill.

*Judgment reversed.*